# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ROGERS TRANSPORT, INC., KEWIN ROGERS, and LISA COBERN, <br><br> Plaintiffs, <br><br> v. <br><br> SAMUEL HOLDEN, II and NATIONAL LIFE INSURANCE COMPANY, <br><br> Defendants. | Case No. 3:21-cv-00485 <br> Judge Aleta A. Trauger |

## MEMORANDUM & ORDER

Plaintiffs Rogers Transport, Inc. ("Rogers Transport"), Kewin Rogers, and Lisa Cobern have filed a Motion to Remand (Doc. No. 9), to which Samuel Holden, II and National Life Insurance Company ("National Life") have filed Responses (Doc. Nos. 16–17). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND[1]

Rogers Transport is a Tennessee-based company founded by Kewin Rogers, who continues to serve as its CEO and president. (Doc. No. 1-1 ¶¶ 1, 8–9.) Lisa Cobern is another Rogers Transport manager. (*Id.* ¶ 16.) In 2017, Rogers "was looking for a financial advisor that could lower or optimize the taxable income of Rogers Transport . . . while also provid[ing] . . . an investment option for managers of Rogers Transport," and someone referred Rogers to Samuel Holden, II, who was an agent for National Life. (*Id.* ¶¶ 10, 30.) According to the plaintiffs, "Holden

---

[1] The facts herein are taken from the Verified Complaint (Doc. No. 1-1) and are recounted only to describe the allegations as the plaintiffs have made them. The underlying facts have not, at this stage, been adjudicated or established by evidence.

held himself out as an insurance agent and financial advisor capable of providing sophisticated investment and tax solutions for companies." (*Id.* ¶ 13.)

The plaintiffs describe their early dealings with Holden as follows:

> Plaintiffs met with . . . Holden several times in person and over the phone in 2017. During those meetings, . . . Holden explained that he had a plan that could (1) decrease the tax liability of Rogers Transport, Inc. and (2) provide great investment returns to management who participated in the plan. . . . Holden represented that this was a plan targeted for management only and not for all employees.

(*Id.* ¶ 11.) Holden explained "that the plan would be funded through life insurance annuities with life insurance policies for participating managers." (*Id.* ¶ 12.)

During the parties' discussions of the strategy, "Rogers repeatedly told . . . Holden that he had no interest in obtaining life insurance because he already had life insurance and such an option was not what he wanted for himself or for Rogers Transport . . . ." (*Id.* ¶ 14.) In response to those objections, "Holden informed Plaintiffs that life insurance was required under the plan to capture the tax benefits." (*Id.*) Holden gave Rogers and Cobern "plan illustrations authored by National Life" and used "these illustrations to demonstrate that his plan would provide . . . Rogers and . . . Cobern a great investment option that would allow them to capture investment earnings fast while offsetting tax liability to Rogers Transport." (*Id.* ¶ 16.) Rogers and Cobern "further emphasized that they did not want nor need life insurance," and Holden responded by telling them "not [to] worry and that any payments under [the] plan would go towards investments." (*Id.* ¶ 17.) When pressed for further explanation regarding how the plan would work, "Holden responded: 'the details of the plan are too complicated for you to understand.'" (*Id.*) He explained "that the complexity of the plan was required to harvest maximum tax benefits [while] providing an excellent investment vehicle and that life insurance was a required part of executing the plan." (*Id.*)

The plaintiffs were sufficiently persuaded and chose to purchase the plan. They made payments directly to Holden, with the expectation that he would establish the plan to accomplish the discussed objectives. (*Id.* ¶ 18.) Holden, working with materials from Pentegra Retirement Services, created a plan titled the "Datair Mass-Submitter Prototype Non-Standardized Defined Benefit Pension Plan (Non-Integrated)." (*Id.* ¶ 19) According to the plaintiffs, it was "a complicated plan that a reasonable person would not understand without the guidance of an experienced professional." (*Id.* ¶ 20.) The plaintiffs state that they went forward with the plan presented to them because they "trusted . . . Holden as an expert and as an apparently sophisticated financial advisor who knew what he was doing in regard to the proposed plan and who represented the plan would accomplish their objectives"—that is, "lowering the tax liability of Rogers Transport . . . and providing investment returns to plan members." (*Id.* ¶¶ 21–22.)

The plaintiffs allege, however, that "Holden never intended to provide any investment opportunities and made all of the foregoing representations with the intent to deceive" the plaintiffs. (*Id.* ¶ 25.) They claim that "Holden never intended to invest their money" and "never formally established a qualified pension plan"; instead, he directed the entirety of their funds to paying premiums on life insurance policies from National Life, resulting in his receiving a "substantial commission." (*Id.* ¶¶ 26–27.) In other words, Holden allegedly led the Rogers Transport managers to believe that he was selling them an inscrutably complex investment strategy that happened to require, as one of its components, the purchase of life insurance plans, when, in fact, he was just *selling them life insurance*, no more and no less.

In October 2019, the plaintiffs contacted Holden regarding how their investments were faring. Holden told Rogers to trust him and not to worry about it. Unsatisfied, Rogers contacted National Life directly and "asked . . . about the status of his annuity investments," but National

3

Life referred the request back to Holden. (*Id.* ¶ 32.) Holden called Rogers and "became confrontational," allegedly insulting and berating him for having failed to trust Holden's expertise. (*Id.* ¶ 33.) As time passed, however, Rogers continued to seek information from Holden about the supposed investments. Holden told Rogers that the investments "were doing great" but initially refused to give any details. (*Id.* ¶ 34.) Rogers continued to press and eventually "vehemently demanded that . . . Holden produce proof as to where [Rogers'] money was," or else the plaintiffs would stop sending payment. (*Id.* ¶ 35.) Holden gave the plaintiffs what was purportedly "a consolidated statement of the returns of their investments, dated as of June 2019." (*Id.*) That document, however, "was a completely fraudulent document that . . . Holden drafted with the intent to deceive" the plaintiffs. (*Id.* ¶ 36.)

The plaintiffs continued to be suspicious and, on September 3, 2020, finally discovered, through another agent, that Holden had "never invested their money, never established a proper qualified plan, and directed all of Plaintiffs' money into National Life insurance premiums and zero to investments." (*Id.* ¶ 39.) By that point, Rogers Transport had already paid $127,952.40, virtually all of which had been directed to insurance premiums. (*Id.* ¶ 40.) The company demanded a refund from National Life, but National Life refused to give one. (*Id.* ¶ 42.)

On May 19, 2021, the plaintiffs filed a Verified Complaint against the defendants in Davidson County Chancery Court. (*Id.* at 1.) The Verified Complaint contains five causes of action. Count I, which is the only count stated against both defendants, is for breach of fiduciary duty. (*Id.* ¶¶ 46–54.) The rest of the claims are against Holden alone. Count II is for fraud. (*Id.* ¶¶ 55–62.) There is no Count III. Count IV is for breach of contract. (*Id.* ¶¶ 63–66.) Count V is for breach of the duty of good faith and fair dealing. (*Id.* ¶¶ 67–72.) Count VI is for promissory

estoppel. (*Id.* ¶¶ 73–78.) The plaintiffs seek "compensatory, consequential, and punitive damages," plus costs and interest. (*Id.* ¶ 79.)

On June 23, 2021, the defendants filed a Notice of Removal. (Doc. No. 1.) As the basis for removal, the defendants asserted that this court has federal question jurisdiction over the claims because the plaintiffs "seek benefits allegedly due under the" life insurance plan, which "falls within the scope of 29 U.S.C. § 1132(a)(1)(B), § 502(a)(1)(B) of" the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"). (*Id.* ¶ 9.) The plaintiffs oppose removal, arguing that they are not seeking benefits under the plan, but rather are suing based on Holden's statements and conduct.

## II. LEGAL STANDARD

Removal from state court to federal court is proper for "any civil action brought in a [s]tate court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). A court considers whether federal jurisdiction existed at the time of removal, and the removing party bears the burden of establishing that the jurisdictional requirements have been met. *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 404 (6th Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). It is well settled in the Sixth Circuit that, "because they implicate federalism concerns, removal statutes are to be narrowly construed." *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 757 (6th Cir. 2000). Thus, when there is uncertainty as to whether remand is appropriate, "[a]ll doubts as to the propriety of removal are resolved in favor of remand." *Smith*, 505 F.3d at 405 (citations omitted).

## III. ANALYSIS

Federal district courts have original jurisdiction over, among other things, "federal question" cases—that is, cases "arising under the Constitution, laws, or treaties of the United

5

States." 28 U.S.C. § 1331. "Ordinarily, determining whether a particular case arises under federal law turns on the 'well-pleaded complaint' rule," which, when applied, typically does not find a federal question based solely on "the existence of a federal defense." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004). The Supreme Court, however, has recognized "an exception . . . to the well-pleaded complaint rule," applicable when "'a federal statute wholly displaces the state-law cause of action through" what the courts refer to as "complete preemption." *Id.* (citing *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003)). The doctrine of complete preemption—a "distinct concept[]" from "ordinary preemption" and relevant primarily to jurisdictional disputes— "recognizes that 'Congress may so completely pre-empt a particular area that any civil complaint raising th[e] select group of claims" within the subject matter of the federal statute "is necessarily federal in character.'" *Roddy v. Grand Trunk W. R.R. Inc.*, 395 F.3d 318, 323 (6th Cir. 2005) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)). Because the Supreme Court considers complete preemption to be "extraordinary," it has only found that it occurs in relation to a small handful of federal statutes. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Metro. Life*, 481 U.S. at 65). One of those statutes is § 502(a) of ERISA, which is codified at 29 U.S.C. § 1132(a). *Roddy*, 395 F.3d at 323.

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Davila*, 542 U.S. at 208. Section 502(a) of ERISA sets forth a list of eleven potential civil causes of action under the Act, including enforcement actions by the U.S Department of Labor. *See, e.g.,* 29 U.S.C. § 1132(a)(5). Among those authorized ERISA causes of action are a number of potential claims by plan beneficiaries, including an action by a beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In light of

6

ERISA's strong preference for uniformity, the Supreme Court has held that "state causes of action that duplicate or fall within the scope of an ERISA § 502(a) remedy are completely pre-empted and hence removable to federal court." *Davila*, 542 U.S. at 206 (internal quotation marks, citation, and alterations omitted).

That rule, however, is tied specifically to § 502 itself and not the broad subject matter of ERISA generally, and, as such, "[c]omplete preemption does not occur every time a complaint mentions an ERISA plan." *Byars v. Greenway*, No. 14-1181, 2014 WL 7335694, at *4 (W.D. Tenn. Dec. 19, 2014) (citing *Wright v. Gen. Motors Corp.*, 262 F.3d 610, 615 (6th Cir. 2001)). Rather, "[a] claim falls in the category of complete preemption" under § 502

> when a claim satisfies both prongs of the following test: (1) the plaintiff complains about the denial of benefits to which he is entitled only because of the terms of an ERISA-regulated employee benefit plan; and (2) the plaintiff does not allege the violation of any legal duty (state or federal) independent of ERISA or the plan terms.

*Milby v. MCMC LLC*, 844 F.3d 605, 610 (6th Cir. 2016) (quoting *Gardner v. Heartland Indus. Partners, LP*, 715 F.3d 609, 613 (6th Cir. 2013)).

The plaintiffs in this case argue that their claims do not satisfy the test for complete preemption jurisdiction under ERISA because (1) the plaintiffs are not alleging that they were denied benefits and (2) the plaintiffs do not allege that the defendants violated any duty under either ERISA or the terms of the underlying plan, but, rather, that Holden violated the ordinary, independent duties not to commit fraud and to honor his commitment as a fiduciary of the plaintiffs. The defendants respond that, despite the plaintiffs' characterizations, this is, in fact, still fundamentally a § 502 case, in that the plaintiffs are beneficiaries of an ERISA-covered benefits plan administered by National Life, and they are complaining about the denial of certain benefits to which they believed themselves to be entitled under the plan—namely, investment returns and

7

tax advantages, in addition to the life insurance itself. The defendants further point out that, even according to the plaintiffs' version of events, they knew that they were buying employment-based life insurance—that is to say, a paradigmatic ERISA benefit—even if they also believed that the life insurance was part of some too-complicated-to-understand investment strategy.

Each competing characterization of the plaintiffs' claims makes a certain amount of conceptual sense. Ultimately, though, the defendants have failed to establish how this case would satisfy the first requirement for complete preemption: that the plaintiffs "complain[] about the denial of benefits to which [they are] entitled only because of the terms of an ERISA-regulated employee benefit plan." *Milby*, 844 F.3d at 610 (quoting *Gardner*, 715 F.3d at 613). The plaintiffs are not complaining about the denial of a benefit to which they are entitled under the employee benefit plan. To the contrary, the crux of their complaint is that they are *not*, in fact, entitled to the tax and investment benefits that they thought they were purchasing.

The plaintiffs' allegation, in its simplest form, is that they were led to believe that they were purchasing one thing, paid for that thing, and then received something else. That "something else" happens to have been an ERISA-regulated employee life insurance plan, but it could have been anything. What matters, according to the plaintiffs' theory of the case, is just that the product that they purchased was not the investment vehicle they had been promised. The obligation not to trick another person into buying a product they do not want does not arise from ERISA or any plan document, but from longstanding state-law principles governing fraud and, if applicable, fiduciary duties. *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 970 (C.D. Cal. 2015) (finding no complete preemption because "the alleged fraudulent practices . . . implicate duties derived from state law, which imposed upon Providers an independent 'duty to refrain from making misrepresentations in the presentation of insurance

8

claims for benefits'" (quoting *United Healthcare Servs., Inc. v. Sanctuary Surgical Ctr., Inc.*, 5 F. Supp. 3d 1350, 1361 (S.D. Fla. 2014)); *Gulf Coast Plastic Surgery, Inc. v. Standard Ins. Co.*, 562 F. Supp. 2d 760, 769 (E.D. La. 2008) (finding no complete preemption where the plaintiffs alleged that the defendant "failed to procure the increase in policy limits that plaintiffs specifically requested and . . . then misrepresented that the increase had taken effect when in fact it had not").

As the Eleventh Circuit Court of Appeals observed in a somewhat similar case, in which the court found a lack of federal jurisdiction, the plaintiffs are suing National Life in its capacity as "the seller of insurance products, not" its capacity as "the ERISA fiduciary" for the products themselves. *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1283 (11th Cir. 2005) (finding no complete preemption). As such, they are "not suing for . . . a refusal to pay benefits under the terms of the life insurance policies," which likely would implicate complete preemption. *Id.* at 1290 (quoting *Wilson v. Coman*, 284 F. Supp. 2d 1319, 1334 (M.D. Ala. 2003)) (original alterations omitted). The plaintiffs are not requesting anything under the plan at all; rather, they are seeking damages to compensate them for having been manipulated into buying the plan but not the complex investment vehicle of which the plan was supposed to be merely a necessary, but secondary, component. Because the plaintiffs are not seeking any benefit under the ERISA-regulated plan at issue (or otherwise seeking to enforce or receive clarification regarding the plan), their claims do not give rise to complete preemption under § 502(a).

The doctrine of removability based on complete preemption is an unusual one, operating according to premises distinct both from the ordinary preemption, with which the doctrine shares a name, and from the other grounds for federal jurisdiction that more typically govern removals to federal district courts.[2] Based on the current caselaw, however, it does not appear that this case

---

[2] Indeed, the court notes that the distinct doctrinal foundations of complete preemption as a jurisdictional doctrine and ordinary preemption as a substantive doctrine mean that this court's determination that there

falls within the doctrine's sometimes-uncertain scope. This case, therefore, is simply an ordinary, state law dispute between parties that do not possess complete diversity of citizenship, and it therefore should have remained in state court. This court will return it there.

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal," 28 U.S.C. § 1447(c), and the plaintiffs request such an award here. The decision to award or deny costs upon remand is within the court's discretion, and a threshold finding of "bad faith, improper purpose, or vexatious or wanton conduct" by the defendant is not necessary. *Morris v. Bridgestone/Firestone, Inc.*, 985 F.2d 238, 240 (6th Cir.1993) (citation omitted). Instead, the plaintiff should receive fees and costs "if fair and equitable under all the circumstances." *Id.* (citation and internal quotation marks omitted). The court finds that no award of costs is necessary here. Although the caselaw in this area ultimately supports a remand, the underlying issues are sufficiently contestable that the defendant's attempt at removal was not "objectively unreasonable," which typically (though not always) calls for an award. *Warthman v. Genoa Twp. Bd. of Trustees*, 549 F.3d 1055, 1060 (6th Cir. 2008). Moreover, Congress's strong preference for uniformity and federalization under ERISA makes this court hesitant to deter benefits administrators from seeking removal where there is a colorable basis for doing so. The court, therefore, will remand the case without an award of costs or attorney's fees.

---

is no complete preemption does not preclude the possibility that the plaintiffs' claims might fail, in state court, based on ordinary preemption. *See Cotton*, 402 F.3d at 1281 (noting that substantive preemption under ERISA is broader than complete preemption). This court—which lacks subject matter jurisdiction over this case—makes no determination regarding any substantive issue in that regard.

10

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion to Remand (Doc. No. 9) is hereby **GRANTED**, and this case is **REMANDED** to the Chancery Court for Tennessee's Twentieth Judicial District.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge